**EXHIBIT "A" TO ORDER SETTING PROCEDURE FOR SHORT FORM AMENDMENT OF COMPLAINTS AND INCORPORATION BY REFERENCE OF MATERIALS UNDER SEAL**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) MDL 2804 )  ) Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | ) ) Judge Dan Aaron Polster |
| *All Cases Not Designated In Paragraphs 2 or 3 of CMO-1* | ) ) SHORT FORM FOR ) SUPPLEMENTING COMPLAINT AND ) AMENDING DEFENDANTS AND ) JURY DEMAND |

Plaintiff submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in the Corrected Second Amended Complaint and Jury Demand in the case of *The County of Summit, Ohio, et al., v. Purdue Pharma L.P., et al.,* Case No. 1:18-op-45090 ("*Summit County* Pleadings"), *In Re National Prescription Opiate Litigation,* in the United States District Court for the Northern District of Ohio, Doc. ##: 513, 514,[1] and as may be amended in the future, and any additional claims asserted herein. Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff(s)' existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e). Doc. #: 232.

---

[1] Docket #: 513 is the redacted Summit Second Amended Complaint and Docket #: 514 is the unredacted Summit Corrected Second Amended Complaint filed under seal in Case No. 1:17-md-02804-DAP. The redacted Summit Corrected Second Amended Complaint is also filed in its individual docket, Case No. 1:18-op-45090-DAP, Docket #: 24.

**EXHIBIT "A" TO ORDER SETTING PROCEDURE FOR SHORT FORM AMENDMENT OF COMPLAINTS AND INCORPORATION BY REFERENCE OF MATERIALS UNDER SEAL**

**INCORPORATION BY REFERENCE OF EXISTING COMPLAINT**

1. Plaintiff(s)' Existing Complaint (No. <u>1:19</u>-OP-<u>45098</u>, Doc. #: <u>1-2</u>) is expressly incorporated by reference to this Short Form as if fully set forth herein except to the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

**PARTIES – DEFENDANTS**

2. Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the following Defendants:

[List all Defendants against which claims are asserted. To the extent a claim is not asserted against a particular defendant, so indicate below. Otherwise each claim will be deemed to be asserted against all Defendants (except for the RICO claims identified below). If Defendants have not been sued previously in Plaintiff(s)' Existing Complaint, Plaintiff must include separate factual allegations below in support of each new defendant and must separately serve each newly named Defendant with notification of the specific ARCOS data that Plaintiffs claim supports the addition of this Defendant pursuant to the Court's Order Setting Procedure for Short Form Amendment of Complaints and Incorporation by Reference of Materials Under Seal]

<u>Please see Attachment A.</u>

I, <u>Danielle Salerno</u>, **Counsel for Plaintiff(s), certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff(s).**

**I further certify that, except as set forth below, each of the Defendant(s) newly added herein appears in the ARCOS data I reviewed.**

**I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.**

EXHIBIT "A" TO ORDER SETTING PROCEDURE FOR SHORT FORM AMENDMENT OF COMPLAINTS AND INCORPORATION BY REFERENCE OF MATERIALS UNDER SEAL

**The following newly added Defendant(s) *do not appear* in the ARCOS data I reviewed:**

Teva Pharmaceutical Industries Ltd.; Allergan plc f/k/a Actavis plc; Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Actavis LLC; Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Warner Chilcott Company, LLC; Actavis Mid Atlantic LLC; Actavis Laboratories UT, Inc.; Actavis Laboratories FL, Inc.; Richard Sackler; Kathe Sackler; Jonathan Sackler

**Dated:** 5/28/19  **Signed:** Danielle Salerno

Factual Allegations Regarding Individual Defendants

    2.1   Please see Attachment A.

    2.2

## COMMON FACTUAL ALLEGATIONS

3. By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Summit County* Pleadings as identified in the Court's Order implementing the Short Form procedure. Doc. #: 514, 1282.

☑ Common Factual Allegations (Paragraphs 130 through 670 and 746 through 813)

☐ RICO Marketing Enterprise Common Factual Allegations (Paragraphs 814-848)

☐ RICO Supply Chain Enterprise Common Factual Allegations (Paragraphs 849-877)

4. If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here. Plaintiff(s) assert(s) the following additional facts to support the claim(s) identified in Paragraph 6 below (below or attached):

## CLAIMS

5. The following federal **RICO causes of action** asserted in the *Summit County* Pleadings as identified in the Court's implementing order and any subsequent amendments,

3

**EXHIBIT "A" TO ORDER SETTING PROCEDURE FOR SHORT FORM AMENDMENT OF COMPLAINTS AND INCORPORATION BY REFERENCE OF MATERIALS UNDER SEAL**

Doc. #: _____, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff(s)'s Existing Complaint (check all that apply):

☐ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Summit County* Pleadings, Paragraphs 878-905)

☐ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq*. – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Summit County* Pleadings, Paragraphs 906-938)

6. Plaintiff asserts the following **additional claims** as indicated (below or attached):

The County is filing this "Short Form" consistent with the MDL court's orders and without prejudice to the County's right to pursue remand of this case to state court. The County expressly maintains that there is no basis for federal jurisdiction over this matter.

7. To the extent Plaintiff(s) wish(es) to **dismiss claims** previously asserted in Plaintiff(s)'s Existing Complaint, they are identified below and will be dismissed without prejudice.

WHEREFORE, Plaintiff(s) prays for relief as set forth in the *Summit County* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated: 5/28/2019                                        Lisa Saltzburg
                                                                    *Attorney for Plaintiff(s)*

4

**Attachment A – to Short Form For Supplementing Complaint and Amending Defendants and Jury Demand ("Short Form") (Tuscarawas County, OH Case No. 1:19-op-45098)**

Paragraph 2:

The following defendants are named in this action:

Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company Inc.; Rhodes Pharmaceuticals, L.P.; Richard S. Sackler; Kathe A. Sackler; Jonathan D. Sackler; Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. N/K/A Janssen Pharmaceuticals, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Mallinckrodt plc; Mallinckrodt, LLC; SpecGx, LLC; Allergan plc f/k/a Actavis plc; Allergan Finance LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Actavis Totowa LLC; Allergan Inc.; Actavis Kadian LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Warner Chilcott Company, LLC; Actavis Mid Atlantic LLC; Actavis Laboratories UT, Inc.; Actavis Laboratories FL, Inc.; Insys Therapeutics; McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; CVS Health Corporation; CVS Indiana, LLC; CVS TN Distribution, LLC; CVS RX Services, Inc.; Ohio CVS Stores, LLC; Omnicare Distribution Center LLC; Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc.; Walmart Pharmacy Warehouse #46; Walmart Pharmacy Warehouse #45; Walmart Pharmacy Warehouse; Discount Drug Mart, Inc.; and Jane Does 1-50.

Jurisdictional Allegations:

The County is filing this "Short Form" consistent with the MDL court's orders and without prejudice to the County's right to pursue remand of this case to state court. The County expressly maintains that there is no basis for federal jurisdiction over this matter.

This Court has personal jurisdiction over all Defendants under R.C. 2307.382 because the causes of action alleged in this Complaint arise out of each Defendants' transacting business in Ohio, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because the Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards Ohio

and/or have the requisite minimum contacts with Ohio to satisfy any statutory or constitutional requirements for personal jurisdiction.

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Ohio, to which this case was removed. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs in this district.

Allegations Specific to Defendants Appearing the in the ARCOS Data:

Rhodes:

Rhodes Pharmaceuticals L.P. is a limited partnership organized under the laws of Delaware with its principal place of business in Coventry, Rhode Island. Although it is registered as a separate corporate entity than "Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company Inc. (collectively, "Purdue"), a former senior manager at Purdue described Rhodes Pharmaceuticals, L.P., as "set up as a 'landing pad' for the Sackler family in 2007, to prepare for the possibility that they would need to start afresh following the crisis then engulfing OxyContin."[1] Further, reporting by the *Financial Times* revealed that a 2017 manual showed that Rhodes and Purdue used the same employee handbook, and employees reported that "little distinction is made internally between the two companies."[2]

Distributor Defendants:

Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center, Inc. is a Maryland corporation with its principal place of business in Camp Hill, Pennsylvania.

---

[1] David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[2] *Id.*

Discount Drug Mart, Inc. ("Discount Drug") is an Ohio corporation with its headquarters principal place of business in Medina, Ohio.

Omnicare Distribution Center LLC, is a Delaware limited liability company with its principal place of business in Cincinnati, Ohio.

Wal-Mart Stores East, LP dba Wal-Mart Pharmacy Warehouse # 45 is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

Wal-Mart Stores East, LP dba Wal-Mart Pharmacy Warehouse #46 is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

Wal-Mart Stores East, LP dba Wal-Mart Pharmacy Warehouse is a Delaware corporation with its principal place of business in Bentonville, Arkansas

CVS RX Services, Inc. is a New York corporation with its principal place of business in Woonsocket, Rhode Island.

CVS TN Distribution, LLC is a Tennessee corporation with its principal place of business in Woonsocket, Rhode Island.

Actavis Entities:

Please see descriptions in Short Form Paragraph 2.1 below.

*The following paragraphs are included to address particular entities that did not appear as the labelers or reporters in the ARCOS data. Although certain of the entities below are also understood to be the labelers for opioids shipped into the jurisdiction, they are identified here as well for clarity, to help explain the relationship to the other defendants.*

Paragraph 2.1:

Teva:

Teva Pharmaceutical Industries Ltd. is a defendant in the *Summit County* action and common factual allegations are incorporated by reference. In addition, Plaintiff states that Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of

3

business in North Wales, Pennsylvania. Teva USA acquired Cephalon, Inc. in October 2011. Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva USA and Cephalon work together closely to market and sell Cephalon products. Teva USA also sells generic opioids in the United States, including generic opioids previously sold by Allergan plc, whose generics business Teva Pharmaceutical Industries Ltd., Teva USA's parent company based in Israel, acquired in August 2016. Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon are collectively referred to as "Teva."

Teva manufactures, promotes, sells, and distributes opioids such as Actiq, a fentanyl lollipop, and Fentora, a dissolving pill throughout the United States. Actiq and Fentora have been approved by the U.S. Food and Drug Administration ("FDA") only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

The close connection between Teva Ltd. and its U.S. subsidiaries, as well as the blurred distinction between them, is shown in Teva's websites. For example, on Teva USA's website is a page entitled "Teva Pharmaceutical Industries Limited," on a page labeled "intended for US residents only," which includes the following: "Teva improves health in the US every day, every minute, every second. One in every six prescriptions dispensed in the US is a Teva product. Approximately 22 prescriptions in the US are filled by Teva products every second.…Teva is the world's largest maker of generic pharmaceutical products."[3] Teva Ltd.'s financial reports list

---

[3] https://www.tevausa.com/Company.aspx

4

Cephalon's and Teva USA's sales as its own, and its year-end report for 2012 attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales . . . ."[4] The United States is the largest of Teva Ltd.'s global markets, and it represents nearly half of its total revenue.[5]

Other publicly available information demonstrates Teva Ltd.'s control over Cephalon's operations. For example, immediately after acquiring Cephalon, Teva Ltd. caused Cephalon to increase its product prices up to twenty-five percent.[6] The two companies combined sales forces,[7] product pipelines, and research and development efforts.[8]

Actavis:

Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Defendant Actavis, Inc. was acquired by Watson Pharmaceuticals, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis PLC in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona,

---

[4] Teva Pharmaceutical Industries Ltd. Annual Report (Form 20-F) (Feb. 12, 2013) at 62.

[5] *Ibid*. at 62-64.

[6] Tracy Staton, *Teva jacks up prices on Cephalon legacy brands* (Dec. 7, 2011), http://www.fiercepharma.com/story/teva-jacks-prices-cephalon-legacy-brands/2011-12-07.

[7] *NASDAQ OMX 27th Investor Program Conference Call,* Teva Pharm. Indus. Ltd. (Dec. 6, 2011, 5:15 AM), http://seekingalpha.com/article/315684-teva-pharmaceuticals-management-presents-at-nasdaq-omx-27th-investor-program-transcript?page=4.

[8] *See generally*, *Teva Pharmaceuticals Industries' Management Presents at Citi Global Health Care Conference (Transcript)* (Mar. 8, 2012), http://seekingalpha.com/article/419471-tevapharmaceutical-industries-management-presents-at-citi-global-health-care-conferencetranscript?page=1.

California, and is a wholly owned subsidiary of Allergan PLC (Allergan Finance, LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).  Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc.  Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Actavis Totowa LLC is a Delaware corporation with its principal place of business in Little Falls, New Jersey.  Allergan, Inc. is a Delaware corporation with its principal place of business in Irvine, California.  Actavis South Atlantic LLC is a Delaware corporation with its principal place of business in Morristown, New Jersey.  Actavis Kadian, LLC is a Delaware corporation with its principal place of business in Sunrise, Florida.  Actavis Elizabeth LLC is a Delaware corporation with its principal place of business in Elizabeth, New Jersey.  Each of these defendants and entities is owned by Allergan PLC, which uses them to market and sell its drugs in the United States.  Collectively, these defendants and entities, and their DEA registrant subsidiaries and affiliates that manufacture, promote, distribute, and sell prescription opioids, are referred to as "Actavis."  The term "Actavis" shall be understood to incorporate all affiliates that owned, manufactured, distributed, monitored, or sold opioid medicines at issue, including: Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; Warner Chilcott Company, LLC; Actavis Mid Atlantic LLC; Actavis Laboratories UT, Inc.; and Actavis Laboratories FL, Inc.[9]

---

[9] Allergan Finance, LLC is a Nevada corporation with its principal place of business in New Jersey. Allergan Sales, LLC is a Delaware corporation with its principal place of business in California. Allergan USA, Inc. is a Delaware corporation with its principal place of business in New Jersey.  Warner Chilcott Company, LLC is a Puerto Rico corporation with its principal place of business in Puerto Rico.  Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey. Actavis Mid Atlantic LLC  is a Delaware corporation with its principal place of business in Delaware.  Actavis Laboratories UT, Inc. is a Delaware corporation with its principal place of business in Utah.  Actavis Laboratories FL, Inc. is a Florida corporation with its principal place of business in Florida.

Actavis manufactures or has manufactured the following drugs as well as generic[10] versions of Kadian, Duragesic, and Opana in the United States:

| Product Name | Chemical Name | Schedule |
| --- | --- | --- |
| Kadian | Morphine sulfate, extended release | Schedule II |
| Norco | Hydrocodone bitartate and acetaminophen | Schedule II |

Actavis publicly proclaims that its network of brands "markets" a portfolio of drugs – including Kadian – and "is focused on developing, manufacturing, and commercializing innovative branded pharmaceuticals."[11] Actavis' website also shows that it engages in a top-down marketing approach across its "global footprint." Actavis promotes itself as committed to a four-part "social contract" with its patients, one of the four pillars of which is "education" – i.e., its "commit[ment] to appropriately educating physicians about our medicines so that they can be used in the right patients for the right conditions."[12] In a 2016 blog post, Allergan's CEO described this activity not as anything new, but as part of an "ongoing effort." *Id.*

The transaction that created Actavis plc converted each share of Actavis Inc.'s Class A common shares into one Actavis plc Ordinary Share. *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7. Actavis Inc. and Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis Inc.; and, Actavis plc maintained all of Actavis Inc.'s officers in the same positions. *See*

---

[10] In August 2016 Actavis' global generics business was acquired by Teva Pharmaceutical Industries Ltd. Allergan plc, Annual Report (Form 10-K), 3 (Feb. 16, 2018) https://www.sec.gov/Archives/edgar/data/1578845/000156459018002345/agn-10k_20171231.htm.

[11] *Actavis Completes Allergan Acquisition*, https://www.allergan.com/news/news/thomson-reuters/actavis-completes-allergan-acquisition

[12] Our Social Contract with Patients, https://www.allergan.com/news/ceo-blog/september-2016/our-social-contract-with-patients

7

*id.* Actavis plc's SEC filings explained that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date." *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7.

Sackler Defendants:

Defendant Richard S. Sackler is a natural person currently domiciled in Florida. He served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s, remaining an active Board member through July 24, 2018. Richard Sackler was President of Purdue Pharma from 1999 to 2003 and Co-Chairman from March 2003 through May 2007. Upon information and belief, Sackler joined Purdue in 1971 as an assistant to his father, Dr. Raymond Sackler. who was then President of Purdue. He served as head of Purdue's Marketing and Research & Development Departments. From 1995-2003, Defendant Richard Sackler oversaw the launch of OxyContin. Richard Sackler, upon information and belief, has long been, and continues to be, the beneficiary of an ownership interest in Purdue and Rhodes. Through his decisions and directives, Richard Sackler knowingly caused and approved the promotion and sales of Purdue and Rhodes opioids. Richard Sackler is the listed inventor on a number of patents assigned to Purdue or Rhodes, including U.S. Patent 9,3861,628, *Buprenorphine-Wafer for Drug Substitution Therapy* (January 9, 2018), a patent issued, *inter alia*, to Sackler and assigned by Sackler and his co-inventors to Rhodes covering a drug for "drug substitution therapy in drug-dependent human subjects." In other words, having played no small part in causing the opioid epidemic, Richard Sackler, through his companies, is poised to profit off of its abatement.

Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. Kathe Sackler was Senior Vice President of Purdue Pharma from December 1999 through May 2007 and also was Vice President role of the Purdue Frederick Company from April 1994 to March 2005. She served as a member of the Board of Directors of Purdue and Purdue-related entities and

8

on various Board committees since the 1990s, continuing into September 2018, and was instrumental in Purdue's "Project Tango."

Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut. Jonathan Sackler served as Senior Vice President of Purdue by 2000, until stepping down in 2003. He has served as a member of the Board of Directors of Purdue and Purdue-related entities since the 1990s.

Defendants Richard, Kathe, and Jonathan Sackler are collectively referred to herein as the "Sackler Defendants."

The Sackler Defendants, upon information and belief, were not only aware of, but approved and exercised control over Purdue's deceptive marketing. The factual allegations in the *Summit County* complaint, including those concerning the manner in which the Sackler family integrated advertising and medicine and the resurgence of opioid use in the United States are incorporated into this Short Form for Supplementing Complaint and Amending Defendants and Jury Demand ("Short Form") by reference.

In addition, in a deposition taken for prior litigation, for example, a Purdue legal secretary named Maureen Sara testified that in late 1999, she sent a memorandum to the Sacklers, including Richard Sackler, about what she had learned on the internet about "crushing the tablets [of OxyContin], taking the coating off, cooking it up. Shooting or snorting it."

According to Barry Meier's book *Pain Killer*, in early 2001, Purdue met with the DEA, which was starting to raise alarms over OxyContin overdoses. Defendant Richard Sackler participated in this meeting and defended OxyContin as an extremely good drug. According to the book, the head of the DEA's Office of Diversion Control leaned across to Defendant Sackler and stated: "People are dying. Do you understand that?" Evidently Richard Sackler either did not understand or care, for Purdue did nothing to rein in Purdue's misleading promotion of OxyContin. And, internally, Richard Sackler chose to stigmatize and blame those who became addicted or

9

began to abuse opioids. In February of 2001, he wrote that: "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals."[13]

Federal prosecutors came to suspect, however, that Purdue and certain of its executives were the criminals. In 2003, while a criminal investigation into Purdue and three other executives was underway, the Sackler Defendants all quietly resigned from their management positions. Nevertheless, the Sackler Defendants, upon information and belief, remained actively involved in Purdue's affairs and would also have been aware of deceptive marketing in their capacity as a board members at all relevant times. This involvement is detailed in internal company documents obtained by the Massachusetts Attorney General, parts of which were made public in *Commonwealth of Mass. v. Purdue Pharma L.P., et al.*, C.A. No. 1884-cv-01808 (BLS2), First Amended Complaint, Complete Unredacted Corrected Version for the Public File Submitted According to Court Order January 31, 2019 (Mass. Super. Ct. Jan. 31, 2019) (hereinafter, the "*MA AG Complaint*"). For example, according to the MA AG Complaint, internal documents show that the Sackler Defendants contemplated selling Purdue after its criminal plea in 2007 and other strategies to allow them to "distribute more free cash flow" to themselves."[14]

As another example, Purdue's Board, while the Sackler Defendants were members, voted to approve a criminal guilty plea by their company, including an Agreed Statement Of Facts admitting, in 2007, that, for more than six years, supervisors and employees *intentionally* deceived doctors about OxyContin: "Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less

---

[13] *Commonwealth of Mass. v. Purdue Pharma L.P., et al.*, C.A. No. 1884-cv-01808 (BLS2), First Amended Complaint, Complete Unredacted Corrected Version for the Public File Submitted According to Court Order January 31, 2019 (Mass. Super. Ct. Jan. 31, 2019) (citing PDD8801133516).

[14] MA AG Complaint (citing PDD9316300629-631).

10

likely to cause tolerance and withdrawal than other pain medications."[15] Purdue's Board, while the Sackler Defendants were members, also voted to enter a Corporate Integrity Agreement with the United States. According to the MA AG Complaint, the Sackler Defendants each certified in writing to the U.S. government that he or she had read and understood the rules under that Agreement, including requirements to ensure that Purdue did not deceive doctors and patients again and to report any deception.[16]

Yet, even after their company pled guilty to criminal charges, the Sackler Defendants still failed to follow the rules. For example, the Sacklers received reports that Purdue continued to mail out thousands of deceptive marketing materials in the first half of 2007 alone, with the single most-distributed material being volume #1 of Purdue's "*Focused and Customized Education Topic Selections in Pain Management*" (FACETS), which falsely claimed that physical dependence on opioids is not dangerous and instead improves patients' "quality of life." Internal documents described in the MA AG complaint illustrate the detailed information provided the Sackler Defendants concerning, for example, the hiring of sales representatives, the reports of concern the company received, and the "Region Zero" prescribers identified, internally, as suspicious.

From the time Purdue first developed OxyContin, the Sackler Defendants were focused on sales. As explained in the *Summit County* complaint, Richard Sackler had grand ambitions for Purdue; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big."[17] At the OxyContin launch party, Richard Sackler spoke as the Senior Vice President responsible for sales, and asking his listeners to envision natural disasters, went on to say: "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense, and white...."[18] When sales

---

[15] 2007-05-09 Agreed Statement of Facts, paragraph 20, *available at* https://www.documentcloud.org/documents/279028-purdue-guilty-plea.

[16] MA AG Complaint ¶ 192.

[17] Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.

[18] MA AG Complaint ¶ 176 (citing PKY180280951).

appeared to slow, or did not meet their expectations in later years, the Sackler Defendants expressed concern and looked for way to increase their sales (and by extension, the volume and dose of opioids being prescribed and used). For example, according to the MA AG Complaint, internal correspondence from 2011 reveals Jonathan Sackler writing to John Stewart concerning sales that "this is starting to look ugly" and they needed to "talk," after which Stewart and the sales team planned a response and to set up a meeting with Jonathan.[19] Similarly, in internal e-mails concerning OxyContin prescriptions, in 2008, Kathe Sackler asked for information on "pressures" and "quantification of their negative impact on projected sales."[20] In 2012, Jonathan Sackler pressed Sales VP Russell Gasdia for periodic updates on sales.[21] Richard Sackler was so deeply involved he even planned to go into the field with a sales representative. So intrusive was his involvement that an internal e-mail reads: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated."[22]

This detailed attention and care given sales and profits contrasted sharply, as explained above and in the *Summit County* Complaint, with the approach to addressing addiction, abuse, and diversion. For example, when Butrans sales were perceived as too low, internal documents described in the MA AG Complaint reveal that Richard Sackler wrote: "This is bad."[23] By contrast, when informed of 59 deaths from OxyContin in a single state, Richard Sackler wrote: "This is not too bad" and further explained that: "It could have been far worse."[24]

Kathe Sackler did pay close attention to opioid addiction, for profit, as part of a secret "Project Tango" which considered expanding Purdue's business into addiction treatment. In connection with "Project Tango," internal documents received by Kathe Sackler stated that "Pain

---

[19] MA AG Complaint ¶ 344 (Citing PPLPC012000326194).

[20] MA AG Complaint (citing PPLPC012000175155).

[21] MA AG Complaint (citing PPLPC012000358983).

[22] MA AG Complaint (citing PPLPC012000368569).

[23] MA AG Complaint (citing PPLPC012000368430).

[24] MA AG Complaint (citing PDD8801151727).

12

treatment and addiction are naturally linked."[25] A confidential presentation made as part of Project Tango highlighted, for example, the "[l]arge unmet need for vulnerable, underserved and stigmatized patient population."[26] Yet, Purdue continued to press its sales tactics.

According to the MA AG Complaint's description of the internal documents, from the 2007 criminal convictions until 2018 alone, the Board, with the Sackler Defendants as members, voted to pay to out more than four billion dollars that would go to the Sackler family.[27] Meanwhile, media reports describe Purdue as considering a bankruptcy filing. In the wake of the 2007 guilty plea and Corporate Integrity Agreement, a 2007 settlement with state attorneys general, and more recent lawsuits by state and local governments, as well as other plaintiffs, the Sackler Defendants should, upon information and belief, have anticipated the liability Purdue faced at the time they voted to take money out of the company.

---

[25] MA AG Complaint (citing PPLPC017000564600; 2014-09-12 & PPLPC016000255303).

[26] MA AG Complaint (citing PPLPC017000564601).

[27] MA AG Complaint ¶ 238 & n. 154 (citing a collection of internal documents).